# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 23-40033

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

August 30, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee,*

*versus*

Ricardo Quintanilla,

*Defendant—Appellant,*

consolidated with

———————————

No. 23-40068

———————————

United States of America,

*Plaintiff—Appellee,*

*versus*

Arturo C. Cuellar, Jr.,

*Defendant—Appellant.*

---------------------------------------------

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 7:19-CR-522-1,
7:19-CR-522-3

---------------------------------------------

Before SMITH, ENGELHARDT, and RAMIREZ, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Arturo Cuellar ("AC") and Ricardo Quintanilla appeal their convictions of various federal offenses related to a conspiracy to bribe officials of Weslaco, Texas, to pick certain contractors for an infrastructure project. They raise nine issues in name and many more in fact. Each issue is either forfeited, not meritorious, or both. We affirm the convictions and sentences.

## I.

The City of Weslaco's water infrastructure had a 50-year lifespan that had run by the 1980s. As early as 1995, the city was "having to deal . . . with water and wastewater plants and the infrastructure." The first projects to repair the system began around 2007 or 2008.

AC's and Quintanilla's convictions arise from their involvement in a scheme to bribe city commissioners in Weslaco to award city contracts for the design and construction of water and wastewater treatment plants to Camp Dresser & McKee ("CDM"), an engineering and construction firm, and Engineer Rolando Briones of Briones Consulting and Engineering, Ltd. The jury found that, as part of the scheme, Quintanilla bribed Commissioner Gerardo Tafolla, and AC bribed Commissioner John Cuellar ("JC"), for official actions taken by the two commissioners in favor of the projects and the retention of CDM and Briones. Leo Lopez, a consultant for CDM and Briones, paid AC and Quintanilla for the bribes given to Tafollo and JC.

JC, a lawyer and AC's first cousin, was a commissioner from 1995

2

until 2014—when he lost his seat. Tafolla, after an unsuccessful bid for the city commission, was elected in 2009. Quintanilla served as Tafallo's campaign manager in both elections. Though Tafolla knew AC during both election cycles, he did not have AC's support.

After Tafolla was sworn into office, in May 2009, Quintanilla introduced Tafolla to Lopez and Briones. Several months later, Lopez, Quintanilla, and Tafolla met and discussed Tafolla's "mending fences" with AC, who was a county commissioner at that time.

The next month, Lopez, Tafolla, Quintanilla, and AC met together at Cimarron Country Club. AC was a county commissioner at that time. That meeting was to mend fences, but the water plant was not discussed.[1]

After the city's approval of CDM's preparation of a preliminary engineering report in January 2011, there was a third meeting—this time among Tafolla, Quintanilla, and Lopez. At that meeting, Quintanilla and Lopez discussed the water plant and how to acquire votes. Although they did not speak to Tafolla directly, "they were saying it loud enough so that [Tafolla] could overhear it, and then [Tafolla] just understood that to mean that they wanted [him] to vote in a particular way." "[Lopez] would look at [Quintanilla] and, you know, just say this is going to be our project, yours and mine, and [Tafolla] was sitting right there, right next to them." "[Lopez] would look at [Tafolla] once in a while, but tr[ied] to focus his intentions on . . . [Quintanilla]." Lopez said he needed votes for the plant. He mentioned

---

[1] There is some discrepancy among parts of the record, and the government's brief that presents it as cohesive is misleading. The relevant parts of the record describing the early series of meetings are just one example of a discrepancy the government papers over. The government says that Meeting #3 is at Cimarron Country Club to talk votes. As we read the record, that meeting was to mend fences but not to discuss votes.

No. 23-40033
No. 23-40068

both Briones and CDM.

After the meeting, Tafolla told Quintanilla he was voting for the plan anyway. Quintanilla said that if Tafolla voted for the plan, Quintanilla would split whatever he received from Lopez with Tafolla. Though Tafolla suggested he'd vote for the plan regardless, he agreed to accept the bribes. Tafolla received envelopes with seriatim payments of $1,000. He had seen Lopez give the envelopes to Quintanilla, who would then split them between Tafolla and himself.

In total, Quintanilla paid Tafolla between $10,000 and $15,000. Tafolla continued to have discussions with Lopez and Quintanilla on this subject every couple of months. When it came time, Tafolla voted for Briones and CDM to receive their respective contracts.

Meanwhile, from 2011 to 2014, AC paid JC $405,000 in bribes through AC's company Quality Ready Mix ("QRM").[2] JC understood that AC expected him to vote for "Briones to serve as the engineer for the design of the water plant and for CDM to be selected as the construction company to build the water plant." Lopez was involved in conversations with JC and AC about the bribery arrangement. Lopez told JC he would be splitting consultant fees with AC. Lopez, AC, and JC concocted a story to pretend the bribes were for JC to do legal work for QRM. But JC did no legal work for QRM.

From July 2012 to February 2016, there were multiple written communications among Briones, LeFevre, Quintanilla, and Lopez about the water treatment plant. Of particular note, in November 2012, LeFevre emailed Lopez about the need to execute a backdated consulting-services

---

[2] JC stopped receiving payments in November 2014 when he lost his bid for reelection.

agreement to protect themselves—presumably from legal liability.

From April 2014 to December 2015, there were numerous written communications between Briones and the city regarding the water treatment plant, at least one of which was sent to Lopez. In a series of city commission meetings between 2011 and 2014, Tafolla and JC took actions in support of CDM's and Briones's involvement in the construction of the plant.

From March 2008 to December 2016, the city paid CDM, Briones and LeFevre roughly $42.5 million—about $34 million to CDM, $8.5 million to Briones, and $150 thousand to LeFevre. Then the funds moved around among CDM, Briones, Lopez, and the defendants. Ultimately, Lopez paid AC roughly $1.4 million ending in November 2014 and Quintanilla $93,930 ending in October 2014.

A few years later, AC and Quintanilla were indicted, and Judge Alvarez was assigned to the case. AC and Quintanilla were charged with various federal offenses related to the bribery scheme. That included a notice of criminal forfeiture and an advisory that the government might seek a money judgment. Shortly before trial, the government narrowed the indictment, removing portions and shortening time frames.

At some point during the pendency of the trial, Quintanilla came to the office of John Gonzalez, the city attorney. Quintanilla asked Gonzalez to testify that Gonzalez had hired Quintanilla as a consultant. When Gonzalez refused, Quintanilla left unhappy. He returned minutes later to say, "you better not f*** this up for me." Gonzalez got the impression he was being asked to commit perjury.

In October 2022, the jury convicted Quintanilla of one count of conspiracy to commit honest-services wire fraud (count 1, 18 U.S.C. §§ 1343, 1346, and 1349); four counts of honest-services wire fraud (counts 2, 5, 6, and 7, 18 U.S.C. §§ 1343, 1346); one count of federal program bribery

No. 23-40033
No. 23-40068

(count 8, 18 U.S.C. § 666(a)(2); one count of conspiracy to launder monetary instruments (count 11, 18 U.S.C. § 1956(a)(1)(B)(i), (h)); and eight counts of money laundering (counts 12–19, 18 U.S.C. § 1956(a)). The jury convicted AC of one count of conspiracy to commit honest-services wire fraud (count 1); four counts of honest-services wire fraud (counts 2, 5, 6, and 7); one count of federal program bribery (count 9); one count of conspiracy to launder monetary instruments (count 11); 27 counts of money laundering (counts 20–460); and 27 counts of Travel Act offenses (counts 48–74, 18 U.S.C. § 1956(a)).

In January 2023, the court sentenced Quintanilla to 200 months in custody along with a term of supervised release, a $15,000 fine, $1,500 assessment, $4.1 million restitution jointly with AC and JC, and forfeiture of $75,080. The court sentenced AC to 240 months in custody along with supervised release, a $915,000 fine, $6,100 special assessment, $4.1 million restitution jointly with Quintanilla and JC, and forfeiture of $947,454. Both received downward variances, but AC less so because of his greater profit. The instant appeals followed.

## II.

Before proceeding to the substantive issues on appeal, we clarify two questions that concern how to interact with defendants' briefing.

### A.

*First*, we resolve a dispute on how to interpret defendants' consolidated briefing. Both by its plain text and per our caselaw, Federal Rule of Appellate Procedure Rule 28(i) governs consolidated briefing.[3]

---

[3] *Cf., e.g.*, *Jones v. Johnson*, 180 F.3d 265 (table), 1999 WL 301895, at *2 (5th Cir. May 6, 1999) (per curiam) (unpublished).

No. 23-40033
No. 23-40068

The government correctly notes that the general rule for adoption across briefs is that a defendant cannot adopt a fact-specific challenge "by merely referring to similar challenges in another appellant's brief."[4] Defendants object that the government's caselaw involves adoption by reference rather than consolidated briefing. In their view, "concomitant consolidated briefs inherently represent the arguments of all participating parties" (citing *United States v. Montemayor,* 55 F.4th 1003, 1008 (5th Cir. 2022)). But *Montemayor* did not involve "concomitant consolidated briefs." *Id.* Moreover, *Montemayor* contemplates the proposition opposite to what defendants assert. *See id.*

The government has the better position. There is no reason why components of a consolidated brief that are fact-specific to one defendant should be more liberally imputed to another merely by virtue of the fact that we have one PDF and not two. Moreover, that the same rule—indeed, the same sentence of the same subpoint of the same rule—governs consolidated briefing and argument-adoption should assuage any concern about our referring to Rule 28(i) jurisprudence even if it was written in the context of adoption rather than consolidation.

## B.

Defendants' briefing also leads us to consider the outer limits of the doctrine of forfeiture.[5] "The appellant's brief must contain . . . a statement

---

[4] *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996) (citations omitted); *see also United States v. Morgan,* 117 F.3d 849, 853 (5th Cir. 1997).

[5] The deficiencies are better described as "forfeiture" rather than "waiver." Although the parties use "waiver," and our caselaw often fails to note the difference, we employ the more correct term, "forfeiture," except when quoting the parties' writings or other sources. A recent panel handled a similar situation in this way:

> The parties use the terminology of waiver rather than forfeiture in their

No. 23-40033
No. 23-40068

of the issues presented for review." Fed. R. App. P. 28(a)(5). "[L]itigants must . . . reasonably comply with the standards of Rule 28 in order to preserve them."[6]

Many of defendants' nine expressly appealed issues contain passages that would ordinarily be issues appealed in their own right. For example, Issue #3, labeled a challenge to the "sufficiency of the indictment," includes both unconstitutional-vagueness and sufficiency-of-the-evidence challenges. Even the government's thorough, 93-page brief relies largely on requesting us to consider defendants' "multifarious, vague, [and] conclusory" briefing to be forfeited.

When a party "lists [an] argument as one of the 'issues presented for review' but does not make any argument specifically tailored to [the] claim,"

---

briefing. "The terms waiver and forfeiture—although often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 . . . (2017). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 . . . (1993) (citation and internal quotation marks omitted) . . . .

*Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 369 n.3 (5th Cir. 2024).

[6] *Davison v. Huntington Ingalls, Inc.*, 712 F.3d 884, 885 (5th Cir. 2013). We recognize that *Davison* involves a different sort of deficiency and allows for a more hefty remedy:

Failure to comply with the rules of this court regarding the contents of briefs can be grounds for dismissing a party's claims. Dismissal is warranted where the noncompliance is not merely technical or stylistic, but rather is so fundamental that it prevents the court from engaging in meaningful review.

*See id.* (cleaned up). We do not explore the applicability of *Davison*'s precise errors or the remedy the court imposed there. Rather, we lean on *Davison* only to point out that parties have an obligation to follow the rules of appellate procedure and that failure to do so can yield significant outcome-determinative consequences.

the argument is forfeited. *Kretchmer v. Eveden, Inc.*, 374 F. App'x 493, 497 (5th Cir. 2010) (per curiam). We now clarify that the inverse proposition is also true: Where a party fails to list an issue presented in his or her statement of the issues, the issue is forfeited even if he or she raises the issue in the body of the brief.

That rule is not pedantic. Indeed, a pedantic version is foreclosed by our precedent. "Errant headings in briefs . . . do not waive arguments." *Balentine v. Thaler*, 626 F.3d 842, 849 (5th Cir. 2010). In *Balentine*, the heading in question read, "Ground Eight (IAC — Lockett Doctrine & Risk Assessment): Balentine was denied his federal Eighth and Fourteenth [A]mendment rights to individualized sentencing. Trial counsel failed to present any evidence at all in the punishment phase." *Id.* at 848. That heading did not forfeit an ineffective-assistance-of-counsel claim because it had a relatively clear relationship to the argument made in the body:

> Balentine's claim was for ineffective assistance of counsel. The title of the section in the brief contained the acronym for ineffective assistance of counsel and stated that "counsel failed to present any evidence at all in the punishment phase." Additionally, Balentine presented his argument in terms of *Strickland v. Washington* and *Wiggins v. Smith*, both Sixth Amendment ineffective assistance of counsel cases. Further, the section's subheadings tracked the two-prong test for ineffective assistance of counsel. Subheading two was titled "Trial counsel's performance was deficient" and subheading three was titled "The deficient performance raises a reasonable probability that the outcome would have been different." The magistrate judge properly recognized the claim as an ineffective assistance of counsel claim and ruled on it, and on appeal this court considered the claim to be one for ineffective assistance.

*Id.* (cleaned up).

That sort of technical mislabeling is not what concerns us. Issue #3

No. 23-40033
No. 23-40068

has none of the characteristics of the argument in *Balentine*. There are no headings in defendants' opening brief that cleanly separate the sections and track the law.[7] Nor is there a meaningful substantive relationship to the issue presented. Insufficiency of the indictment has nothing to do with either the sufficiency of the evidence presented at trial or the constitutionality of the statute. Those are quite different substantive issues.

Such a rule is at least nascent in our jurisprudence already. Where parties failed to "include[] the issue in the statement of issues *or* explain[] that they intend[] to appeal this point, they waive[] the issue."[8] "We generally confine our analysis to the issues presented *and* argued in the brief."[9]

Those statements may be unclear. But at least one other formulation considers failure to include an issue in a statement of issues as a non-exclusive factor in finding that that issue was forfeited. "[A]n issue is waived when a plaintiff fails to include the issue in its statement of issues, fails to supply the relevant standard of review, and fails to mention the argument in its reply."[10]

---

[7] This is somewhat better in the reply brief. ("A. No Evidence of *Quid Pro Quo*"); ("B. Statute is Unconstitutionally Vague"). Oddly, though, the two enumerated subsections have nothing to do with "insufficiency of the indictment," which is the claim the issue presented purports to raise. Even so, as with other sorts of forfeiture, the reply brief is too late to salvage an argument. *Cf. DePree v. Saunders*, 588 F.3d 282, 290 (5th Cir. 2009).

[8] *De Beck v. United States IRS*, 622 F. App'x 411, 414 (5th Cir. 2015) (emphasis added) (citing *X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 411 n.3 (5th Cir. 2013)).

[9] *United States v. Bates*, 2023 WL 4542313, at *5, 2023 U.S. App. LEXIS 17999, at *12–13 (5th Cir. July 14, 2023) (unpublished) (emphasis added).

[10] *Norwood v. City of Mendenhall*, 630 F. App'x 245, 248 n.5 (5th Cir. 2015) (citing *X Techs., Inc.*, 719 F.3d at 411 n.3). Another area of the law provides an even more on-point example. In bankruptcy, an analogous failure when appealing to the district court unambiguously constitutes forfeiture. "It is clear under the law of this circuit that an issue that is not designated in the statement of issues in the district court is waived on appeal." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 324 (5th Cir. 2016) (citation omitted).

In short, what has been done in this case constitutes forfeiture. If a defendant appeals the sufficiency of the indictment, then we will consider the sufficiency of the indictment. We will not use a scalpel to extract whatever latent independent arguments parties inconspicuously smuggle in.

### III.

AC and Quintanilla contend that the government constructively amended the indictment. It did not.

### A.

Defendants suggest that a claim of constructive amendment is reviewed *de novo* and that it is a *per se* reversible error if the court finds that the indictment has been constructively amended. The government correctly points out that our contemporary caselaw differs (where a defendant has not objected in the district court to a purported constructive amendment):

> Prior to the Supreme Court's decision in *United States v. Olano*, this court had held that constructive amendments are reversible *per se*. Our post-*Olano* decisions, however, have concluded that plain error review applies even if there has been a constructive amendment.

*United States v. Bohuchot*, 625 F.3d 892, 897 (5th Cir. 2010) (cleaned up).

It is undisputed that the defendants did not raise that objection in the district court. Therefore, we will vacate the convictions on that ground only if

> (1) there was an error or defect, a deviation from a legal rule—that has not been intentionally relinquished or abandoned; (2) the legal error must be clear or obvious, rather than subject to reasonable dispute; (3) the error affected the defendant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings; and (4) when these three elements are present, a

No. 23-40033
No. 23-40068

court may exercise its discretion to correct the error, although this discretion ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (cleaned up).

## B.

On plain-error review, these defendants lose for two independent reasons. *First*, a defendant has not demonstrated plain error when he "fail[s] to meaningfully address all four prongs of plain-error review either in his opening brief or in reply." *United States v. Green*, 47 F.4th 279, 289 (5th Cir. 2022).[11] Even with a minimalist reading of "meaningfully," it is hard to find meaningful analysis of prong (3) or prong (4) in the briefing. That should end our inquiry.

## C.

*Second*, even if defendants had addressed all the prongs of plain-error review, they have failed to demonstrate error.

A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment.

*United States v. Robles-Vertiz*, 155 F.3d 725, 728 (5th Cir. 1998) (internal quotation marks and citations omitted).

But if the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment,

---

[11] *See also, e.g.*, *United States v. Gentile*, 93 F.4th 855, 859 (5th Cir. 2024).

the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.

In other words, the key inquiry is whether the jury charge broadened the indictment; if it only narrowed the indictment, no constructive amendment occurred.

*United States v. Griffin*, 800 F.3d 198, 202 (5th Cir. 2015) (internal quotation marks and citation omitted).

Defendants' briefing does not reflect a correct understanding of what a "constructive amendment" is. Rather, their challenge to "constructive amendment" lumps together several issues that range from sufficiency of the evidence to material variance. We address, in turn, each of those that has been concretely presented.[12]

### 1.

Defendants argue that while the indictment charged a single conspiracy, "the government failed to prove that there was a conspiracy or [*sic*] between the co-defendants." In their view, "[i]f a conspiracy could be found at all, there were two separate conspiracies." That sounds like two challenges: one to the existence of a conspiracy at all, and one to the number of conspiracies. But the defendants only meaningfully contend the number of conspiracies.

That is not properly a constructive-amendment challenge, but, instead, a challenge alleging a fatal variance.[13] Therefore, the argument is for-

---

[12] Anything else is forfeited for inadequate briefing. *Cf. Young v. Repine (In re Repine)*, 536 F.3d 512, 518 n.5 (5th Cir. 2008) (finding an argument "waived" (forfeited) where the court could not "discern the basis or substance of [the party's] argument, if indeed she [wa]s making one.").

[13] *See United States v. Urquidi*, 71 F.4th 357, 381 (5th Cir.) ("[A] material variance

feited according to the standard we expounded above in Part II.

It is also meritless. The standard we apply to a fatal-variance challenge is very deferential:

> The question of whether the evidence establishes the existence of a single conspiracy or multiple conspiracies is a question of fact for the jury. We will affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.

*Urquidi*, 71 F.4th at 381 (internal quotation marks and citations omitted). To count conspiracies, "we look to (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *United States v. Shah*, 84 F.4th 190, 223 (5th Cir. 2023) (cleaned up).

Factor (1) is construed broadly such that "[a] common pursuit of personal gain is sufficient." *Id.* And that's precisely what we have here: a common goal of personal gain by diverting Weslaco's business to CDM and Briones.

As for factor (2), "if the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect then that supports a finding of a single conspiracy." *Id.* (cleaned up). The two commissioners bribed by the two defendants took actions to further the awarding of contracts to CDM and Briones over the objection of others. Even if AC and JC were completely unaware of the relationship between Quintanilla and Taffolla,

---

occurs when evidence presented at trial proved multiple conspiracies, while the indictment alleged only a single conspiracy." (citation omitted)), *cert. denied*, 144 S. Ct. 268 (2023)).

their mutual coordination through CDM-consultant Lopez to achieve the success of the overall scheme warrants a finding of one conspiracy.

Though factor (3) is the closest, the government points out that "[t]here is no requirement that every member must participate in every transaction to find a single conspiracy. Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) (cleaned up). Both defendants interacted with Lopez, who put the whole scheme together. Moreover, there is at least one meeting that included both AC and Quintanilla.

Given the deferential standard of review, the government has adequately proved one conspiracy.

2.

AC maintains that "[i]n another instance of constructive amendment, the government failed to show that AC owed a fiduciary duty to the City of Weslaco that would make him liable for honest-services fraud. AC was at no point a public official for the City of Weslaco."

That is really a sufficiency-of-the-evidence challenge that includes both whether the "convictions . . . are . . . supported by sufficient evidence" and "what conduct constitutes an offense[.]" *United States v. Cooper*, 38 F.4th 428, 432 (5th Cir. 2022) (citations omitted). Like the fatal-variance challenge, this is waived for the reasons set forth in Part II, and like the fatal variance challenge, it is also not meritorious.[14]

---

[14] The decision in *Percoco v. United States*, 598 U.S. 319 (2023), is of no import because the theory of liability in that case was different. There, the lower courts held a private individual liable based on his own "duty to provide honest services to the public during the time when he was not serving as a public official." *Id.* at 324. But here, the

No. 23-40033
No. 23-40068

### 3.

There are a few other miscellaneous claims—none of which is meritorious.

Defendants complain of the striking of allegations that JC had called special meetings. That, they aver, was because the description of the indictment of those meetings did not match the government's evidence. They seem to suggest that that "broadened the criminal charges in the indictment by pursuing convictions for AC and Quintanilla making legitimate constituent inquiries rather than directing any particular vote."

That does not follow. Defendants' contention is not sufficiently fleshed out to avoid forfeiture. *See United States v. Maez*, 961 F.3d 366, 377 (5th Cir. 2020). Even if it was not forfeited, their contention demonstrates constructive amendment's inverse: The government narrowed rather than broadened the indictment. *See Griffin*, 800 F.3d at 202.[15]

Similarly, defendants assert that "the Superseding Indictment alleged that the [defendants] caused Weslaco to engage in improper no-bid contracts, but constructively amended the indictment to abandon proving this factual allegation." That paragraph cites no law, so it is forfeited. *United States v. Trevino*, 989 F.3d 402, 404 n.3 (5th Cir. 2021). But it also seems to be an example where the government shrunk—rather than expanded—the scope of the indictment. *See Griffin*, 800 F.3d at 202. If a legal theory can be parsed from this paragraph, it is that the government is bound to prove every fact

---

liability is not based on AC's duties. Instead, the liability is grounded in JC's and Tafolla's duties to the public.

[15] The defendants throw out another single-sentence example: "The Superseding Indictment also red-lined the allegation that bribes were funneled through a lawyer's IOLTA Account, but this too was not what the [g]overnment proved." No citation to the record or law follows.

No. 23-40033
No. 23-40068

alleged in the indictment, or else it has improperly engaged in constructive amendment. That's not our law, and defendants proffer no authority to suggest otherwise.[16]

## IV.

We turn to AC's argument that Judge Alvarez should have recused. The relevant facts are that in January 2015, a driver for AC's company, J-III Trucking, got into a traffic accident with Judge Alvarez, the district judge *à quo*. AC is the sole owner and registered agent of his company J-III. In March 2015, Judge Alvarez sought the greater of $500,000 and the policy maximum (which was $1,000,000) from J-III's insurer. In January 2016, Judge Alvarez was deposed for the lawsuit. In March 2016, the case settled for $60,000.

We review the denial of a motion to recuse for abuse of discretion. *United States v. Merkt*, 794 F.2d 950, 960 (5th Cir. 1986) (citation omitted). But any arguments raised for the first time on appeal are reviewed only for plain error. *United States v. Allen*, 587 F.3d 246, 251 (5th Cir. 2009) (per curiam) (footnote omitted).

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The relevant inquiry is whether a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Johnson v. Lumpkin*, 74 F.4th 334, 341 (5th Cir. 2023) (internal quotation marks and citation omitted). "[T]he reasonable person standard in the recusal context contemplates a well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical,

---

[16] The same applies to the shrinking of the timeframe of the indictment and the removal of Daniel Garcia.

17

and suspicious person." *Trevino v. Johnson*, 168 F.3d 173, 179 (5th Cir. 1999) (internal quotation marks and citation omitted). "Each § 455(a) case is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995) (citation omitted).

Other circuits have indicated that involvement in litigation with a party is not enough to warrant recusal. *See In re Taylor*, 417 F.3d 649, 652 (7th Cir. 2005); *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977).[17] But this case differs from each of those in multiple ways. In *Taylor*, the earlier litigation (1) named the judge as a defendant, (2) was "one small part of a frivolous litigation pattern," and (3) occurred eight years before the criminal case. *See* 417 F.3d at 653. This case differs on all three fronts: (1) The judge was the plaintiff in the earlier litigation, (2) the earlier litigation was meritorious, and (3) only three years passed between the cases.

While it might not appear that the first distinction matters, and though it was not dispositive, *Taylor* plainly held that when the judge is the *defendant* in the earlier case, recusal is frequently unwarranted. That makes sense. Indeed, "[o]ne reason for" the lack of a "*per se* rule of disqualification" based on earlier litigation is that it "would allow litigants to judge shop by filing a suit against the presiding judge." *Id.* at 652 (citations omitted). *Grismore* seems to be a clean implementation of that rationale: "A judge is not disqualified merely because a litigant sues or threatens to sue him." 564 F.2d at 933.

---

[17] This is also consistent with Fifth Circuit precedent. *See*, *e.g.*, *In re Hipp, Inc.*, 5 F.3d 109, 116–17 (5th Cir. 1993) ("[A] judge is not disqualified merely because a litigant sues or threatens suit."); *Ocean-Oil Expert Witness, Inc. v. O'Dwyer*, 451 F. App'x 324, 329 (5th Cir. 2011) ("Judges are not required to recuse just because they have been or are involved in litigation with a party.").

No. 23-40033
No. 23-40068

Even so, "a reasonable man, were he to know all the circumstances, would [not] harbor doubts about the judge's impartiality" in this case. *Johnson*, 74 F.4th 334, 341.  As the government put it at oral argument, "The recusal motion was based on an unremarkable insurance settlement from an auto accident that was between an employee of JIII trucking . . . and the judge in her personal capacity.  The lawsuit and settlement did not involve [AC] except that he accepted the service of process because he was the registered agent of [J-III] . . . ."

The government is correct.  Judge Alvarez did not sue AC, but rather, J-III.  AC's only personal involvement with that litigation was as a registered agent who was personally served with the suit.[18]  The cost of the litigation appears to have been born by J-III's insurance company.  And the whole incident occurred a few years before this criminal case commenced.

AC lists several instances that, he thinks, are indicia of actual bias.  We disagree.  Likewise, that Judge Alvarez transferred a case involving AC in 2015 seems to be of little probative value.  The cause of that transfer is disputed, and it seems to be that the transfer was merely a matter of judicial economy.

With all this context, a reasonable observer would not harbor doubts about Judge Alvarez's impartiality.  She need not have recused.

## V.

Defendants challenge the sufficiency of the indictment to convict on Counts 1, 2, 5, 6, and 7.  That effort fails.

Since the standard of review is unclear here, we will pretermit the

---

[18] Even if AC were deposed in his capacity as owner, as the reply brief suggests, that would not change our analysis.

No. 23-40033
No. 23-40068

standard of review and assume it is *de novo*.  Even under that more lenient standard, defendants fail to present a meritorious claim.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted).

The indictment alleges that defendants conspired to "deprive the City of Weslaco, the Weslaco City Commission, and the citizens of Weslaco of their intangible right to the honest services of [JC] and [Tafolla], both elected officials, through bribery."  On its face that seems sufficient because, pre-*McNally v. United States*, 483 U.S. 350 (1987), "the Courts of Appeals, one after the other, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights."  *Skilling v. United States*, 561 U.S. 358, 400 (2010).  But defendants contend that "those counts involving honest services wire fraud and bribery require bribery appurtenant to a property interest."[19]

Defendants first point to *McNally*, which held that property-law statutes do not "proscribe[ ] schemes to defraud citizens of their intangible rights to honest and impartial government."  483 U.S. at 355.  But that does

---

[19] In relevant part, 18 U.S.C. § 1343 reads,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits . . . for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . .

And 18 U.S.C. § 1346 states that "[f]or purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the tangible right of honest services."

not control because, in 1988, Congress responded to *McNally* by enacting § 1346 to extend liability to honest-services fraud. *Skilling*, 561 U.S. at 404.

So, defendants turn to a more recent string of cases. *Skilling* held that "§ 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409. But defendants never actually explain how their case falls outside the "bribe-and-kickback core of the pre-*McNally* case law." A charitable reading of their position is that they think *Skilling* means that § 1346 extends only to bribes *for* kickbacks. But that's not a tenable reading. *See* 561 U.S. at 409–10 (comparing the "bribe-and-kickback" core to a situation in which there was no explicit bribe).

Nor does *United States v. Kelly*, 140 S. Ct. 1565 (2020), do defendants any favors, *id.* at 1574. There, the Court noted that "the scheme . . . did not aim to obtain money or property." *Id.* But *Kelly* involved a different factual and statutory basis. Though both *Kelly* and this case reference § 1343, two crucial differences remain. *First*, part of § 1343—the part at issue in *Kelly*—involves "obtaining money or property." *Id.* at 1568. But § 1343 also contains broader language about fraud presumably relevant here. *Second*, *Kelly* is not an honest-services-fraud case and makes no reference to § 1346.

Finally, defendants turn to *Ciminelli v. United States*, 598 U.S. 306 (2023). That undermines their case. *Ciminelli* concerned the right to control, not the intangible right to honest services, which it contrasts with the right to control. *Id.* at 314.[20]

Defendants make two additional contentions in this section. Each is forfeited for the reasons set out in Part II.B. Each contention also fails for other independent reasons.

---

[20] Above we deal with the inapplicability of *Percoco*.

No. 23-40033
No. 23-40068

*First*, in their opening brief, defendants suggest that these statutes charge based on an intangible right of honest services that is unconstitutionally vague. But defendants provide no standard for when a statute is unconstitutionally vague nor any real substantive explanation of why this statute meets that standard. So it is forfeited for inadequate briefing. *Cf. United States v. Soto*, 566 F. App'x 363, 366 n.1 (5th Cir. 2014) (per curiam).

*Second*, defendants gesture at a sufficiency challenge. But that gets only one sentence in the opening brief, despite more substantial coverage in the reply brief. "[T]he [g]overnment provided no evidence of anything more than 'mere consent' to provide money in the case of Quintanilla's payments to Tafolla; and absolutely zero evidence of any consent by AC to provide money to [JC]." We never get any law about what the legal standard is for us to find insufficient evidence. That is forfeited. *See Trevino*, 989 F.3d at 404 n.3.

## VI.

AC contends that the district court improperly chilled a witness's testimony.

### A.

That, AC contends, is a due process issue that is reviewed *de novo* (citing *United States v. Williams*, 343 F.3d 423, 439 (5th Cir. 2003), and *Webb v. Texas*, 409 U.S. 95 (1972) (per curiam)). The government proposes that we review only for abuse of discretion (citing *Geders v. United States*, 425 U.S. 80, 86–87 (1976)).

AC is right. Insofar as he raises a challenge under *Webb*, that is a due process challenge to be reviewed *de novo* under *Williams*. *Geders* involved a more quotidian challenge to "the order in which parties will adduce proof." 425 U.S. at 86 (citations omitted). We review *de novo*.

No. 23-40033
No. 23-40068

## B.

AC takes issue with the district court's admonition of a witness—partially before a jury, partially before the media, and partially at a sidebar—after which the witness elected to seek advice of counsel. AC compares this situation to the one in *Webb*. In that case, outside the presence of the jury, the judge delivered the following admonition to the defense's only witness:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the lik[e]lihood is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

409 U.S. at 95–96. "The witness then refused to testify for any purpose and was excused by the court." *Id.* at 96. The Court ruled for the defendant, noting,

> The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to as-

sure him that if he lied, he would be prosecuted and probably
convicted for perjury, that the sentence for that conviction
would be added on to his present sentence, and that the result
would be to impair his chances for parole.

*Id.* at 97 (footnote omitted). The Court implied that while some of these
actions alone might have been okay, taken together and placed in the larger
context they were not. *See id.* at 97–98.

The admonition in this case is far afield from the one in *Webb*. The
court and the prosecutor hearing the testimony of AC's son were concerned
that he was self-incriminating for federal offenses still within the statute of
limitations. They quickly moved for a sidebar to discuss the issue. They dis-
missed the jury. The judge made plain to AC's son that he had the right to
consult an attorney and that the trial could be paused for him to do so. AC's
son exercised that right. And he returned to testify the next day.

Plainly, that is not the quasi-bullying of the defendant's only witness
off the stand that was at issue in *Webb*. Here, the judge went out of her way
to keep things away from the jury (and even the media at points) and not to
pressure the witness one way or the other, and the witness did ultimately
testify. This is not a problem under *Webb*.

VII.

Quintanilla also questions the way evidence was handled. He avers
that the court erred in admitting certain statements in violation of the Con-
frontation Clause and others in violation of the Federal Rules of Evidence.

A.

Though Quintanilla suggests his contentions receive only plain-error
review, it appears that he did object in the district court, so we review *de novo*.
*See United States v. Olguin*, 643 F.3d 384, 391 (5th Cir. 2011) (citations
omitted). "Once a court determines that a defendant's rights under the Con-

frontation Clause were violated, then it must determine whether the error was harmless beyond a reasonable doubt." *United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006). If the court finds that Confrontation Clause rights were not violated, then, "[t]o demonstrate an abuse of discretion, [a defendant] must show that the limitations imposed upon his counsel's cross-examination were clearly prejudicial." *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (footnote omitted).

## B.

First, Quintanilla challenges the admission of statements made by Lopez as a violation of his rights under the Confrontation Clause. But any challenge to statements by Lopez is forfeited. "A defendant who challenges the improper admission of testimony that potentially includes hearsay 'must specifically identify the particular statement[s] he is challenging.'"[21] Paraphrasing the trial record is not enough.[22]

Though this challenge does involve "testimony that potentially includes hearsay," *id.*, one might say that it is ultimately a Confrontation Clause challenge, and the *Trevino* line of cases is about hearsay rather than the Confrontation Clause. In this instance, that is a distinction without a difference, largely because "[t]he Confrontation Clause applies to testimonial hearsay and does not bar the admission of nonhearsay statements." *United States v. Ballesteros*, 751 F. App'x 579, 579–80 (5th Cir. 2019) (per curiam) (citation omitted).

That means the hearsay inquiry is a necessary precursor to the Con-

---

[21] *United States v. Trevino Chavez*, 830 F. App'x 425, 428 (5th Cir. 2020) (per curiam) (quoting *United States v. Martinez-Perez*, 941 F.2d 295, 300 (5th Cir. 1991)); *see also United States v. Robinson*, 87 F.4th 658, 671–72 (5th Cir. 2023).

[22] *See Trevino Chavez*, 830 F. App'x at 428.

frontation Clause inquiry. All the reasons that failing to identify a specific statement forfeits a hearsay challenge apply with equal force to the Confrontation Clause.

This case is an exemplary illustration. Because Quintanilla's challenge is—as the government charitably describes it—"unclear," the government is left parsing out various reasons why different parts of the challenged parts of the record do not raise Confrontation Clause issues. A defendant cannot make broad-strokes objections on appeal to a lengthy audio recording and force the government to provide line-by-line responses. Yet, that is not all too far from what happened here.

The statements that Quintanilla mentions with the most specificity come belatedly in his reply brief. First, he objects to the admission of Lopez's question asking Tafolla when his involvement with the project began. But since that question was a non-rhetorical question, it's hard to say it was being offered for its truth value rather than to show Tafolla's response. The second objection is also a question from Lopez asking Quintanilla and Tafolla what their cover story should be. Again, it's hard to say that that is being offered for its own truth rather than to show the response.[23]

The judicial effort to resolve this question regarding any other statements illustrates why forfeiture applies here. First, we would need to examine how Lopez's statements were used in the context of the trial to see whether they were introduced for the truth of the matter asserted. Then, we would have the discretion to analyze harmlessness. We will not do that on

---

[23] Even were it not, in analogous situations, we admit otherwise inadmissible statements merely to provide helpful context to admissible ones. *See United States v. King*, 93 F.4th 845, 851–52 (5th Cir. 2024). *Cf. Robinson*, 87 F.4th at 673 ("[A]n interlocutor's statements, even if considered hearsay, are admissible to put the defendant's statements into context.") (cleaned up).

No. 23-40033
No. 23-40068

Quintanilla's behalf.

## C.

Quintanilla objects to an admission of a statement via Elizabeth Walker from LeFevre about the project's being a "beached whale."[24] We agree with the district court that this was not offered for its truth. Quintanilla does not point to a flaw in that reasoning as he is so obliged. That ends our inquiry. *See Ramey v. Davis*, 942 F.3d 241, 248 (5th Cir. 2019).

## D.

Quintanilla challenges the admission of certain of Lopez's statements under the Federal Rules of Evidence. As above, this is forfeited because Quintanilla does not identify a single statement by Lopez with requisite specificity.

## VIII.

Defendants challenge the exclusion of expert testimony about contracts and privileged emails.

## A.

Insofar as defendants challenge the evidentiary rules or their application as an abridgment of their Sixth Amendment right to a complete defense, their claims are reviewed *de novo* but subject to harmless error. *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008). Otherwise, evidentiary rulings are reviewed for abuse of discretion. *United States v. Shah*, 95 F.4th 328, 374 (5th Cir. 2023).

Not every challenge to an evidentiary ruling implicates constitutional

---

[24] A metaphor for something that is stuck or stranded.

27

rights. Rather,

> Defendants are deprived of this right when evidence rules infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve. Even if an evidentiary rule itself is not arbitrary or disproportionate to its purposes, a specific application of the rule can nevertheless violate the right to present a complete defense if it does not rationally serve the end that the rule was designed to promote.

*Lucio v. Davis*, 751 F. App'x 484, 493 (5th Cir. 2018).

## B.

Defendants make no attempt to show why the exclusion of this expert testimony is a *constitutional* violation, so we review for abuse of discretion. They fault the judge for denying this evidence as untimely. They contend that the expert testimony would have made clear that the decisions that were made were necessary.

As the government points out, that is not relevant. "It is not a defense to bribery that, had there been no bribe, the official might have made the very recommendation the briber wanted him to make." *United States v. Reeves*, 892 F.2d 1223, 1226 (5th Cir. 1990). Though the bar for relevance is low, the need for repairs was not relevant to the criminality of the conduct. Therefore, the judge did not abuse her discretion by excluding the expert testimony.

## C.

Defendants concede that the emails—the exclusion of which they challenge—were properly barred under the rules of evidence; instead, they suggest a constitutional due process challenge. But they do not explain why excluding the emails makes the trial unconstitutionally unfair. A cite to *War-*

*dius v. Oregon*, 412 U.S. 470 (1973)—without so much as a pin cite—doesn't cut it. This is forfeited for inadequate briefing, but even if not, it seems likely that these documents were privileged and that the district court did not abuse its discretion.[25]

## IX.

AC challenges the calculation of his sentencing base level.

### A.

"We review purely legal conclusions or interpretations of the meaning of a sentencing guideline de novo, and review the trial court's findings of fact for clear error." *United States v. Roussel*, 705 F.3d 184, 195 (5th Cir. 2013) (citation omitted). "There is no clear error if a factual finding is plausible in light of the record as a whole." *United States v. Mendoza-Gomez*, 69 F.4th 273, 276 (5th Cir. 2023) (citation omitted).

### B.

*First*, AC objects that he was not a public official for purposes of sentencing because he was not a Weslaco public official or at least "not in a position of public trust for carrying out any Weslaco governmental affairs or functions related to the alleged offense." AC does not challenge that he was a public official *somewhere*, and he quite clearly is such, based on the Guidelines, which counsel us to read the term broadly. U.S. Sent'g Guidelines Manual § 2C1.1, cmt. n.1. The government correctly notes that

---

[25] In the reply brief, defendants raise for the first time the argument that "The Sixth Amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce the discovery rules or orders." Because it is raised for the first time in the reply brief, we need not consider the argument. *See Louisiana v. Biden*, 45 F. 4th 841, 844–45 (5th Cir. 2022). Even so, it is without merit. The relevant part of *United States v. Davis*, 639 F.3d 239, 243 (5th Cir. Unit B Mar. 1981), has since been expressly abrogated. *See United States v. Wills*, 40 F.4th 330, 338 (5th Cir. 2022).

"subsections B and E of the guideline definition of public official plainly do not require that the status as a public official have any nexus to the crime." This part of AC's challenge is without merit.

*Second*, AC objects that the monetary value that went into the calculation was wrong. He asserts that the judge used her personal experience to find that Weslaco "did not get the benefit of its contracting." He also avers that "the total amounts received by other from Lopez totaled $1.6 million" and that he should be liable for a fraction or none of that. The full text of the Guidelines provision reads,

> (2) If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, *whichever is greatest*, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

*Id.* § 2C1.1(b)(2) (emphasis added).

AC does not contest that $4.1 million was paid to Lopez. Any amount that "forms part of the basis of the conspiracy conviction" is part of the "offense" for § 2C1.1 purposes. *United States v. Richard*, 775 F.3d 287, 297 (5th Cir. 2014). Therefore, using the $4.1 million amount is appropriate.

In the reply brief, AC briefly adds two novel arguments. *First*, he claims that the amount of money was not foreseeable to him. The averment is raised for the first time in reply and without legal support, so we do not consider it. *Second*, he asseverates that "the [g]overnment could not determine any loss amount." That's also new to the reply brief and subject only to clear-error review. The few lines of the record hastily tossed out in support of this novel contention are not enough to support a finding of clear error.

Finally, AC notes that the incorrect base levels led to improper fines

No. 23-40033
No. 23-40068

down the line.  But since the base level is right, this contention is meritless.

## X.

AC challenges the imposition of a forfeiture and restitution.

### A.

AC's sentencing challenge to forfeiture is meritless.  He suggests that since forfeiture is an aspect of sentencing, and an illegal sentence is plain error, the forfeiture order is reviewed *de novo*.  That's not right.  The opinion in *United States v. Del Barrio*, 427 F.3d 280, 282 (5th Cir. 2005)—on which AC relies—applies only to challenges to sentences in excess of statutory maxima.  Challenges to forfeiture raised for the first time on appeal are reviewed only for plain error.  *See United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017).  The district court's findings of fact are reviewed for clear error.  *See United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005) (citation omitted).

But AC did not order the transcript of the sentencing hearing regarding forfeiture.  Failure "to include a transcript of all relevant evidence" per Federal Rule of Appellate Procedure 10(b)(2) constitutes forfeiture of the issue.  *See Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 890 (5th Cir. 1993).  Because the evidence taken at the forfeiture hearing was likely relevant,[26] that ends our inquiry.

In the alternative, there is no clear error.  AC's only non-conclusory challenge to the sentencing forfeiture is based on *Honeycutt v. United States*, 581 U.S. 443, 447 (2017), which bars joint and several liability with respect to forfeiture related to drug crimes.  But (1) AC was not held jointly and sev-

---

[26] As the government points out, it "anticipated that evidence at a forfeiture hearing would show that because of the sham legal expenses attributed to QRM."

No. 23-40033
No. 23-40068

erally liable with respect to his *forfeiture* order, and (2) the government correctly points out that *Honeycutt* interpreted a different statute.

## B.

AC's challenge to the restitution order is also meritless.

> We review the quantum of an award of restitution for abuse of discretion. We review the district court's factual findings for clear error. A factual finding is clearly erroneous only if based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed. We may affirm in the absence of express findings if the record provides an adequate basis to support the restitution order.

*United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (cleaned up).

AC's challenge to restitution assumes that the government did not prove a single conspiracy. But the government did so. *See supra*.

## XI.

Quintanilla challenges the application of the obstruction-of-justice enhancement.

## A.

"A finding of obstruction of justice under § 3C1.1 is a factual finding reviewed for clear error. However, we review the district court's interpretation or application of the sentencing guidelines de novo." *United States v. Edwards*, 303 F.3d 606, 645-46 (5th Cir. 2002) (citation omitted). "In order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole." *Id.* at 645 (citation omitted). We give particular deference to the finder of fact when the finding is based on the credibility of witnesses. *Cf. Anderson v. City of Bessemer City*, 470 U.S. 564,

573–74 (1985).[27] Moreover, "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

## B.

The obstruction-of-justice increase applies to "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so." U.S. Sent'g Guidelines Manual § 3C1.1, cmt. n.4(a).

The district court found that "there is no question but that [Gonzalez] was being asked to mislead at the very, very least the FBI if not to outright lie to the FBI." The court based that finding at least in part on Gonzalez's credibility. Quintanilla's objection is that Gonzalez's definition of consultant differs from Quintanilla's supposedly correct view of what constitutes being a consultant at trial and that Quintanilla "was merely trying to determine if Gonzalez was going to provide truthful testimony."

Particularly given the deferential standard by which we evaluate the district court's finding, we do not agree that Quintanilla "was merely trying to determine if Gonzalez was going to provide truthful testimony." Quintanilla showed up at Gonzalez's office at the morning, asked him to testify that Quintanilla was a consultant, left visually upset, came back shortly later, and swore at Gonzalez. That gave Gonzalez the impression that he was being asked to commit perjury. In these circumstances, the record plausibly supports that Quintanilla did not actually believe he had been a consultant and

---

[27] Though *Anderson* is a ruling about the clear-error standard in the context of Federal Rule of Civil Procedure 52(a), our court has applied it in evaluating findings under § 3C.1.1 of the Sentencing Guidelines. *See United States v. Flournoy*, 1992 WL 386808, at *2 (5th Cir. Dec. 23, 1992) (per curiam) (unpublished). Unpublished opinions before 1996 are precedential. 5th Cir. R. 47.5.3.

was trying to get Gonzalez to testify falsely that Gonzalez considered Quintanilla a consultant.[28]

## XII.

Finally, appropriately for the first time in a Federal Rule of Appellate Procedure 28(j) letter,[29] defendants suggest that *Snyder v. United States*, 144 S. Ct. 1947 (2024), impacts this case. *Snyder* held that 18 U.S.C. § 666 does not make "it a crime for state and local officials to accept gratuities— for example, gift cards, lunches, plaques, books, framed photos, or the like— . . . given as a token of appreciation after the official act." *Id.* at 1951. It also noted that state and local officials are "allowed to hold outside employment." *Id.* at 1952.

Defendants connect *Snyder* to this case only by suggesting that JC was allowed to hold outside employment. But the government's case is in no way dependent on JC's ability to hold outside employment. Recall that though Lopez, AC, and JC concocted a story to pretend the bribes were for JC to do legal work for QRM, JC did not do legal work for QRM.

*Snyder* does not call into question the validity of defendants' convic-

---

[28] There is a separate question, perhaps—though it is not cleanly raised here— about whether Gonzalez was actually a consultant and therefore what Quintanilla was asking him to testify to was not actually false. Even were this properly raised, it would fail for two reasons. *First*, we would have to overcome the clear-error standard in determining that Quintanilla was actually a consultant; it is not likely we could meet that bar. *Second*, it might not matter whether Quintanilla was actually a consultant. For example, one could interpret the record as Quintanilla's asking Gonzalez to testify that *Gonzalez considered* him to be a consultant. If that's the case, then this is plainly obstruction. Gonzalez obviously did not consider Quintanilla to be a consultant.

[29] *See Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312, 317 n.5 (5th Cir. 2015) ("An intervening change in the law, however, normally does not permit a party to raise an entirely new argument that could have been articulated below or in the party's opening brief." (cleaned up)). *Cf. United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017).

No. 23-40033
No. 23-40068

tions. Unlike *Snyder*, this is a case about bribes rather than gratuities, and the jury was instructed to that effect. This case is wholly dissimilar to *Snyder*—which involved a single payment well after the official act without any evidence of an agreement beforehand, *see* 144 S. Ct. at 1951, 1954—and defendants do little to show otherwise.

\* \* \* \* \*

This was a well-tried case by the district court. The judgments of conviction and sentence are AFFIRMED.